UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| AARON WILSON | : | DOCKET NO. 5:12-cv-0310 |
| D.O.C. # 458937 | | |
| | | |
| VERSUS | : | JUDGE WALTER |
| | | |
| BURL CAIN | : | MAGISTRATE JUDGE KAY |

REPORT AND RECOMMENDATION

Before the court is an application for a writ of habeas corpus pursuant to 28 U.S.C § 2254, filed by Aaron Wilson ("petitioner") [doc 1], who is represented by counsel in this matter. The petitioner is a prisoner in the custody of the Louisiana Department of Public Safety and Corrections. He is currently incarcerated at the Louisiana State Penitentiary at Angola. Burl Cain ("respondent"), warden, has responded [doc. 44].

This matter is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons IT IS RECOMMEDED that the application be **GRANTED IN PART** and **DENIED IN PART**.

I.
BACKGROUND

A. *Conviction*

The petitioner was indicted by a grand jury in the 1st Judicial District Court, Caddo Parish, Louisiana, on February 8, 2001, for first degree murder. Doc. 44, att. 3, p. 24. The indictment related to the petitioner's involvement in the December 23, 2000 robbery, kidnapping, rape, and murder of Vickie McGraw. *See State v. Wilson*, 938 So.2d 1111, 1117–18 (La. Ct. App. 2d Cir. 2006).  At the time of the offense the petitioner was 17 years old.  The petitioner was convicted on

-1-

August 13, 2002, of first degree murder following a trial by jury. Doc. 44, att. 3, pp. 20–21. A sentencing trial was held and the jury unanimously recommended the death penalty. *Id.* at 21–22. The trial court adopted the jury's recommendations, sentencing the petitioner to death on September 25, 2002. *Id.* at 23.

After sentencing the United States Supreme Court ruled in *Roper v. Simmons*, 125 S.Ct. 1183 (2005), that the death penalty was unconstitutional for juvenile offenders. The Louisiana Supreme Court ordered that the petitioner's death sentence be vacated and remanded the case to the 1st Judicial District with instructions to resentence him to life imprisonment without the benefit of parole, probation, or suspension of sentence. *State v. Wilson*, 899 So.2d 551 (La. 2005). The sentence was imposed according to the Louisiana Supreme Court's instructions on June 6, 2005. Doc. 44, att. 23, pp. 205–06.

**B. Direct Appeal**

The petitioner then appealed to the Louisiana Second Circuit Court of Appeal, raising several assignments of error. *State v. Wilson*, 938 So. 2d at 1119–47. Relevant to the instant petition are the allegations that:

1.   The trial court correctly found *Batson* violations[1] in the prosecution's use of peremptory strikes against Yvonne Mitchell and Beatrice Maxile but erroneously failed to provide a remedy.

2.   The trial court erred by failing to find *Batson* violations in the prosecution's use of peremptory strikes against other African-American women.

3.   The petitioner's sentence of life without the possibility of parole was unconstitutional in light of his age.

*Id.* at 1121–36, 1145–47. The Second Circuit reviewed these claims on the merits and found no basis for relief. *Id.* Accordingly, it affirmed the petitioner's conviction and sentence. *Id.* at 1147.

---

[1] See explanation of *Batson v. Kentucky*, 109 S.Ct. 1712 (1986), at footnote ___.

The petitioner sought review in the Louisiana Supreme Court, which denied same on April 20, 2007. *State v. Wilson*, 954 So.2d 159 (La. 2007). He then petitioned the United States Supreme Court for a writ of certiorari, which was denied on October 1, 2007. *Wilson v. Louisiana*, 128 S.Ct. 275 (2007).

### C.  State Collateral Review

The petitioner then filed a Uniform Application for Post-Conviction Relief in the trial court on September 26, 2008,[2] claiming ineffective assistance of counsel. Doc. 44, att. 26, pp. 11–16. The trial court reviewed the application on the merits and denied relief on April 13, 2011. *Id.* at 61–63. The petitioner then unsuccessfully sought review in the Second Circuit Court of Appeal. *Id.* at 148. Finally, he applied for supervisory and/or remedial writs with the Louisiana Supreme Court, which denied same on March 2, 2012. *State v. Wilson*, 83 So.3d 1042 (La. 2012).

### D.  Habeas Petition

The petitioner filed the instant application on January 3, 2012. Doc. 1. He renews three claims from his direct appeal, alleging that:

1.   The prosecution violated the Equal Protection Clause when it intentionally discriminated against prospective jurors Mitchell and Maxile, and the state courts unreasonably determined the facts and unreasonably applied clearly established federal law in denying the petitioner's *Batson* claim.

2.   The petitioner's right to equal protection was violated when the trial court failed to find *Batson* violations in the state's use of peremptory strikes against other African-American women.[3]

3.   The petitioner's sentence of life without the possibility of parole is unconstitutional.

---

[2] Date of filing is provided in the state's response. *See* Doc. 44, att. 26, p. 22.
[3] For ease of analysis this court considers the meaning of the trial court's ruling and whether it erroneously failed to provide relief as one claim, and then considers the merits of the *Batson* challenge as to each prospective juror under the second claim.

Doc. 1, pp. 13–66 (reordered from the petitioner's brief). He then requested a stay of proceedings, in order to allow Louisiana state courts to rule on the constitutionality of his sentence in light of a recent Supreme Court decision relating to mandatory life sentences for juveniles. Doc. 45, att. 1, pp. 1–4 (citing *Miller v. Alabama*, 132 S.Ct. 2455 (2012)). The stay was imposed [doc. 46] until February 25, 2015, following the petitioner's motion to lift it after his Motion to Strike an Illegal Sentence under *Miller* had been considered and denied by all appropriate state courts. *See* Doc. 52, att. 1, pp. 2–3 (reviewing state court exhaustion); Doc. 54 (electronic order granting motion to lift stay).

**II.**
**LEGAL STANDARDS ON HABEAS REVIEW**

*A.* ***Timeliness***

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This period generally runs from the date that the conviction becomes final. 28 U.S.C. § 2244(d)(1)(A). The time during which a properly-filed application for post-conviction relief is pending in state court is not counted toward the one-year limit. 28 U.S.C. § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n.1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and the filing of the federal habeas application. *Mayle v. Felix*, 545 U.S. 644, 644 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d)

the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the petitioner filed his federal habeas corpus petition.

### B. Procedural Default and Exhaustion of State Court Remedies

Exhaustion and procedural default are both affirmative defenses that may be waived by the state if not raised in its responsive pleadings. *See, e.g.*, *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994). However, the federal district court may also consider both doctrines on its own motion. *Magouirk v. Phillips*, 144 F.3d 348, 357–59 (5th Cir. 1998). Before considering the merits of the issues raised in this petition, this court evaluates the claims under the doctrines of procedural default and exhaustion of state court remedies.

#### 1. Exhaustion of State Court Remedies

The federal habeas corpus statute and decades of federal jurisprudence require a petitioner seeking federal habeas corpus relief to exhaust all available state court remedies prior to filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734, 740–41 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts "in a procedurally proper manner according to the rules of the state courts." *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *E.g.*, *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir. 1987). Exhaustion is not satisfied if the petitioner presents new legal theories or entirely new factual

claims in support of his federal habeas petition. *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983).

In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a). Thus, in order for a Louisiana prisoner to have exhausted his state court remedies he must have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner, supported by the legal theories and factual allegations that he raises now. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

### 2.  *Procedural Default*

When a petitioner has defaulted a claim by violating a state procedural rule which constitutes adequate and independent grounds to bar direct review in the United States Supreme Court, he may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 111 S.Ct. 2546, 2554 (1991). Failure to satisfy state procedural requirements results in forfeiture of a petitioner's right to present a claim in a federal habeas proceeding. *Murray v. Carrier*, 106 S.Ct. 2639 (1986). This is not a jurisdictional matter; rather, it is grounded in concerns of comity and federalism. *Trest v. Cain*, 118 S.Ct. 478, 480 (1997).

Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default) or (2) the petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is considered to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). The grounds for

procedural default must be based on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989).

### C.   General Principles

When a state court adjudicates a petitioner's claim on the merits, this court reviews the ruling under the deferential standard of 28 U.S.C. § 2254(d). *Corwin v. Johnson*, 150 F.3d 456, 471 (5th Cir. 1998). Section 2254(d) provides that a writ of habeas corpus shall not be granted unless the state court's adjudication on the merits resulted in a decision that was either (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. A petitioner must demonstrate that the "fair import" of the state court decision shows that the court failed to apply the controlling federal standard. *Early v. Packer*, 537 U.S. 3, 9 (2002) (per curiam). Furthermore, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011). A decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedents and arrives at a [contrary] result . . . ." *Bell v. Cone*, 543 U.S. 447, 452-53 (2005), quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotations omitted).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination. Instead he must demonstrate that the factual determination was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Rather, the petitioner has to show that "a reasonable factfinder **must** conclude" that the determination of facts by the state court was unreasonable. *Rice v. Collins*, 546 U.S. 333, 341 (2006) (emphasis added).

### III.
#### ANALYSIS

As a preliminary matter this court reviews the petitioner's application for timeliness, failure to exhaust state court remedies, and procedural default. If the claim is procedurally viable, its merits are considered under the general standards set forth in Section II.C.

#### A. *Timeliness*

Here the petitioner's conviction became final on October 1, 2007, with the denial of his petition for a writ of certiorari from the United States Supreme Court. 361 days were thus counted toward his one-year limit until the filing of his application for post-conviction relief on September 26, 2008. The instant petition was filed while his state collateral proceedings were still pending, and so no additional time was counted under § 2244(d). Therefore the matter is timely.

### B.  *Exhaustion of state court remedies and procedural default*

#### 1.  *Exhaustion of state court remedies*

The petitioner's first and second[4] claims were exhausted through his direct appeal. His third claim, relating to the mandatory life sentence, was exhausted through the direct appeal and the state court proceedings following *Miller v. Alabama*. Accordingly, all claims have been exhausted and are properly before this court.

#### 2.  *Procedural default*

All claims were considered on the merits by the Second Circuit, as the last court to issue a judgment on the direct appeal. Although the opinions of the state courts on the Motion to Strike are not in the record, the petitioner contends that denial was based on the merits rather than on any procedural issue. *See* Doc. 52, att. 1, pp. 2–3. The respondent does not oppose this contention. Therefore no claim is procedurally defaulted.

### C.  *Substantive Analysis*

Having determined that all claims can be heard by this court under § 2254, we now consider each one by ascertaining the appropriate standard of review and then applying that standard to the merits of the argument.

---

[4] The respondent contends that the third claim was only partially exhausted because the petitioner's brief in its direct appeal did not discuss the *Batson* violations as to Rose Bogan and Malenda Theus. Doc. 44, att. 1, p. 28. The petitioner also contends that the strike against Bogan is entitled to de novo review because the trial court did not specifically address the prosecution's reasons for striking her during the *Batson* hearing. Doc. 1, p. 65; *see* Doc. 44, att. 14, pp. 175–76. However, consideration of a *Batson* challenge requires the court to review "all relevant circumstances." *Batson*, 106 S.Ct. at 1723. The trial court's failure to offer specific comments on Bogan during the hearing does not mean that she was not considered in its final ruling, and it is clear from the transcript that the judge was in the courtroom and heard the testimony relating to the strike against her. Doc. 44, att. 14, pp. 175–76. Additionally, the Second Circuit's opinion shows that the challenges to Bogan and Theus were nonetheless considered on appeal. *Wilson*, 938 So.2d at 1127–28. We therefore consider the entire claim exhausted and find no grounds for considering the strike against Bogan de novo.

### 1.  *Trial court rulings/Standard of review on Batson challenge*

The petitioner alleges that his right to equal protection under the Fourteenth Amendment was violated by the prosecution's use of race or gender-motivated peremptory strikes ("*Batson* violations")[5] against several prospective jurors. Before reaching the merits of the individual challenges, however, we must resolve the petitioner's challenges to the standard of review applied by the Second Circuit and his contention that the trial court erroneously failed to provide relief after finding intentional discrimination in the strikes used against two prospective jurors.

### a.  *Whether the trial court found purposeful discrimination in response to the Batson challenge as it related to prospective jurors Yvonne Mitchell and Beverly Maxile*

The petitioner alleges that the trial court found purposeful racial discrimination in response to the defense's *Batson* challenge regarding Yvonne Mitchell and Beatrice Maxile, and that the Second Circuit erred in failing to defer to these findings.

A trial court's determination of whether the state has provided race-neutral reasons for a peremptory strike (in other words, whether it has survived the *Batson* challenge) is treated as a finding of fact. *See Miller-El v. Dretke*, 125 S.Ct. 2317, 2325 (2005). Thus it should only be overturned on federal habeas review if rebutted by clear and convincing evidence. *Id.* As a preliminary matter, however, we must resolve the disagreement over whether the trial court actually found a *Batson* violation with respect to Mitchell and Maxile.[6]

---

[5] The Supreme Court held in *Batson v. Kentucky*, 109 S.Ct. 1712 (1986) that the state's use of peremptory strikes to remove prospective jurors based on race violated the Fourteenth Amendment. The Court extended this holding to prohibit intentional discrimination on the basis of gender in *J.E.B. v. Alabama*, 114 S.Ct. 1419 (1994).

[6] In *Parker v. Dugger*, the Supreme Court held that an appellate court's determination of a trial court's ambiguous finding on a sentencing issue was a question of fact because "no determination of the legality of Parker's sentence . . . necessarily follows from a resolution of the question of what the trial judge found." 111 S.Ct. 731, 739 (1991). Here, however, a legal determination did necessarily follow from the trial court's findings because of the requirement under *Batson*, discussed *infra*, that the trial court grant relief if it found racial discrimination in the prosecution's use of peremptory strikes. Therefore we review the Second Circuit's interpretation for its contrariness to or unreasonable application of federal law. § 2254(d)(1).

The trial court issued a written opinion following a hearing on the defense's *Batson* challenge and the prosecution's allegation that the defense was also attempting to exclude white women from the jury. Doc. 44, att. 9, pp. 18–22. Concentrating on the defense's strikes against prospective jurors Sarah Greenwald and Susan Dees, who were white females, and the prosecution's strikes against Mitchell and Maxile, the court expressed criticism at the fact:

> . . . that, after Counsel exercised their respective peremptory strikes, the composition of the tentative jury selected is absent a significant number of African-American females and white females. And considering the explanations asserted by the State and Defendant for using their peremptory strikes, this Court readily concludes that, as to [Mitchell], [Maxile], [Greenwald], and [Dees], said explanations are not persuasive and/or plausible. This Court believes that the State was reluctant to have a jury composed of African-American females and the Defendant was fearful to have a jury composed of white females.

> A cursory review of Louisiana cases indicated to this Court that Louisiana trial courts generally defer questions of improper use of peremptory strikes to the Appellate Courts. However, in order to adequately minimize equal protection violations caused by improperly using peremptory strikes based upon race and/or gender, the trial court judge must be willing to inquire and seriously weigh allegations of race and gender discrimination at the time the jury is selected in order to give meaningful application to *Batson* principles and safeguard the rights of the defendant, State, and even venire persons.

> After having inquired and weighed the allegations presented in the pending Motions, this Trial Court Judge finds that the State and Defendant have dismissed certain jurors for reasons which are not race and/or gender neutral. Perhaps absent malice yet with an awareness of the existence of the *Batson* principles, Counsel for the Defendant and the State have camouflaged their desires and intent to select a jury most favorable to their objectives among expressed reason(s) and arguments of neutrality which appear to be merely "pretextual." In view of the race and gender of the Defendant (African-American male) and victim (white female), this Trial Court Judge detects and senses a racial and gender bias in dismissing certain prospective jurors by using peremptory strikes. This Court believes that a Defendant, as well as a victim, deserve a jury that looks like them whenever possible **and it was possible in this particular case**. Each person summoned as a prospective juror is also entitled to be included regardless of race or gender.

> However, notwithstanding its findings, this Court shall **deny** both oral Motions subject of this Opinion because this Court does not believe

-11-

> that the "pretextual" explanations given by the Defendant and State, **especially the State**, are significantly faulty under Louisiana case law standards to constitute a violation. Consequently, this Court shall empanel the selected jurors, proceed with this trial, and defer the merits of said Motions to the Appellate Court.

*Id.* at 20–22 (emphasis in original).[7] The Second Circuit found that the trial court ultimately denied the *Batson* challenge, but still sought to resolve the ambivalence expressed before that denial. *Wilson*, 938 So.2d at 1123. Accordingly, it reviewed the defense's *Batson* challenge and determined that the trial court's "findings of race-based strikes" against Mitchell and Maxile were "clearly erroneous." *Id.* at 1124–33. Thus it determined that the trial court had "correctly concluded that there was no Equal Protection violation and correctly denied the defendant's *Batson* objection." *Id.* at 1133.

Unlike the Second Circuit, we are not persuaded that the trial court's comments on potential pretext amounted to finding a *Batson* violation. Under clearly established state and federal law, a trial court is required to rule on a *Batson* objection by determining whether or not purposeful discrimination by the non-moving party has been proven.[8] Here the trial court expressed heavy criticism against race- and gender-based motivations in peremptory strikes, finding that race-and gender-influenced reasoning had been used in the peremptory strikes applied by both sides. Doc.

---

[7] The trial court also offered the following oral comments along with its ruling:

> [A]s I indicated to you on yesterday, I'm a realist. I've read the case law, and with exception, Mr. Glassell, of *State v. Harris*, which you provided the Court, the state supreme court decision from June of this summer, I believe that consistent with the significant case law of this state, this trial is denying both *Batson* related motions. **And I'm deferring to the appellate court to affirm this Court's position that based upon Louisiana case law, the exclusion of certain jurors by peremptory strikes in this particular case does not raise to a level to constitute a violation. If I thought that the case law would agree with me, I would have granted both motions.**

Doc. 44, att. 15, p. 5 (emphasis added).

[8] *See, e.g.*, *Batson*, 106 S.Ct. at 1724 ("The trial court then will have the duty to determine if the defendant has established purposeful discrimination."); *State v. Givens*, 776 So.2d 443, 448 (La. 2001) ("Then, the trial court must determine whether the party challenging the strike has carried the ultimate burden of proving purposeful discrimination.")

44, att. 9, p. 21. The trial court wrote that it sensed bias on both sides and that the parties' arguments "appear[ed] to be" (rather than were) pretextual. *Id.* However, it also stated in both its written and oral comments that the apparent pretext was insufficient to justify finding a *Batson* violation under existing case law. *Id.* at 22; Doc. 44, att. 15, p. 5. Thus the ultimate finding was that the defense had not carried its burden in proving intentional discrimination with regards to Mitchell, Maxile, or any of the other challenged strikes.

Accordingly, federal habeas review is confined to whether the trial court's finding of **no** *Batson* violation was clearly erroneous, and the Second Circuit's standard of review as applied to Mitchell and Maxile merits no further consideration. The Second Circuit's failure to correctly interpret the trial court's findings also means that it could not have properly considered all relevant factors in its review of the petitioner's *Batson* challenge. *See Snyder v. Louisiana*, 128 S.Ct. 1203, 1208 (2008) ("[I]n reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted.")  We will therefore look through the Second Circuit's decision and review the trial court's finding of no discrimination, applying it to all seven challenged strikes *infra*.[9]

### b. *Whether trial court erroneously failed to provide relief*

The petitioner also alleges that the trial court erroneously failed to provide relief, based on the his contention that the trial court found intentional discrimination in the strikes against Mitchell and Maxile and the trial court's statement that it would "defer the merits of [the *Batson* challenge] to the Appellate Court" and "empanel the selected jurors." Doc. 44, att. 9, p. 22. We have already found, however, that the trial court ruled on the merits of the *Batson* challenge when it explicitly

---

[9] Because we have found that the trial court's ultimate finding was one of no discrimination in the strikes against Mitchell and Maxile, we need not consider whether the Second Circuit correctly reviewed the trial court's findings on this issue.

denied the defendant's motion. The trial court's language regarding deferring judgment thus appears to be another way of saying that the Second Circuit Court of Appeals could review the matter. The fact that the trial court did deny the motion means that there was no error in empaneling of the jury. Accordingly, this claim offers no basis for federal habeas relief.

### 2.  *Merits of Batson challenge*

When a defendant raises a *Batson* challenge the trial court considers the issue through a three-step inquiry. *Batson*, 106 S.Ct. at 1723–24. First it must determine whether the defendant has made a prima facie case for discrimination. *Id.* at 1723. The burden of production then shifts to the prosecution to articulate a race-neutral explanation for the challenge. *Id.* at 1723–24. Lastly the court determines whether the defendant has established purposeful discrimination. *Id.* at 1724. The final step is based on the "persuasiveness of the [prosecution's] justification," but it remains the defendant's burden of proof.[10] *Purkett v. Elem*, 115 S.Ct. 1769, 1771 (1995) (per curiam).

"A state trial court's finding of the absence of discriminatory intent is a 'pure issue of fact' that is accorded great deference and will not be overturned unless clearly erroneous." *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005). Because such a finding necessitates denial of the *Batson* challenge, as explained *supra*, this claim is reviewed as a question of fact.

The defense raised a *Batson* challenge after twelve jurors had been empaneled but before alternates had been selected based on the fact that the prosecution had used eight of eleven peremptory strikes against African-American women. Doc. 44, att. 14, pp. 166–67, 169–70. After

---

[10] We agree with the petitioner [doc. 50, pp. 9–10] that there is no sign that the burden of proof was misapplied in the trial court's consideration, contrary to the Second Circuit's comments. *See Wilson*, 938 So.2d at 1122, 1131 (stating that the trial court may have impermissibly shifted the burden by calling the prosecutor back to defend her reasons for striking certain prospective jurors). It appears that the trial court was still exploring the persuasiveness of the prosecution's justification, and as such required additional statements from the prosecutor, but there is no evidence based on its ultimate ruling that it shifted the burden of proof away from the defense. *See United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993) ("The shifting burden described in *Batson* is one of production only. The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination.")

challenges for cause there were eleven African-American women out of a jury pool of thirty-five. *Id.* at 169–70. Because the defense had also used a peremptory strike against a different African-American woman, only two African-American women remained in the final selection of twelve jurors. *Id.* Accordingly, the defense alleged systematic exclusion of the African-American female prospective jurors based on race. *Id.* at 171. Accepting these statistics as prima facie evidence of discrimination, the trial court then heard justification from the prosecutor on each of the challenged strikes.

Accordingly, this court reviews the prosecution's reasons for the strikes and evidence from the record[11] cited by both parties in order to determine whether the denial of the *Batson* challenge was clearly erroneous.

### a.  Yvonne Mitchell

The prosecution justified its challenge against Yvonne Mitchell based on her marriage to a minister at a local church. Doc. 44, att. 14, p. 176. It had struck a white male venire member on similar grounds, because he was "also a minister."[12] *Id.* at 217–18. Regarding Mitchell, the prosecution expressed concern "about somebody so close to being the religious leader of so many people. I believe that it would be difficult for her to go back there and actually vote for the death

---

[11] The petitioner now requests expansion of the record to introduce strike sheets and trial counsel file showing that a peremptory strike was also used against a black male prospective juror during selection of alternates. He also wishes to introduce evidence of historic discrimination in Caddo Parish. Our review of the *Batson* challenge, as stated above, is confined to whether the trial court's findings of fact were unreasonable "in light of the **evidence presented in the state court proceeding**." § 2254(d)(2) (emphasis added). Although the trial judge would have known of the prosecution's strike against Myles and would likely have been aware of Caddo Parish's history, these facts were not entered into evidence. In fact, the defense specifically based its *Batson* challenge on the  use of peremptory strikes against black female prospective jurors, requesting "that [the prosecution] be required at this point to come forward and give race neutral reasons for excusing the black females pursuant to the *Batson* case." Doc. 44, att. 14, pp. 170–71. Therefore the evidence the petitioner seeks to introduce is outside the scope of federal habeas review of this claim, and his request is denied.

[12] This prospective juror was William Valentine, discussed *infra*.

penalty under any circumstances knowing that she must return to her church and to her husband and tell them that she has done so . . . ."[13] *Id.* at 176–77.

The petitioner maintains that the justifications for the strike against Mitchell were pretextual and race-based. He points to the fact that the prosecution never actually questioned Mitchell, who otherwise appeared to be a favorable juror for the state, on her religious views or those of her husband's church.[14] On the other hand, it briefly questioned prospective juror Karen Scott, who held a certificate of ministry and was active in her church, and juror William Leech, a deacon, on their church involvement (including the specific religious views of Scott's church). *Id.* at 104–105; Doc. 44, att. 10, p. 164. The prosecution did not strike Scott or Leech. The petitioner also alleges that the strike against Mitchell was grounded in the fact that her husband's church was predominately African-American.

Under this court's clear error review, the distinction between the minister and his spouse versus those with lay involvement in a church cannot be disregarded. The respondent also points out that Valentine, like Mitchell, was otherwise a favorable juror to the state – he had an uncle who was murdered, his wife had been the victim of an armed robbery/attempted abduction, and he testified that he was able to consider the death penalty after weighing mitigating factors – and yet the prosecution's bias against having ministers on the jury was strong enough that it still struck

---

[13] Although the trial court warned that the prosecution's reasons were "an assumption" and that Valentine, the white minister discussed *infra*, was "different" [doc. 44, att. 14, p. 178], its comments must be reconciled with its ultimate finding of no *Batson* violation. They are therefore minimally persuasive in establishing clear error in the trial court's final ruling.

[14] The petitioner maintains that the failure to engage in a meaningful voir dire with Mitchell over the religious beliefs of her husband's church shows that its explanation was pretextual. Doc. 50, p. 12 (citing *Miller-El v. Dretke*, 125 S.Ct. 2317, 2328 (2005)). However, the prosecution noted that Mitchell did not mention what her husband's occupation was or even that she was married in her juror questionnaire. Doc. 44, att. 14, pp. 215–16. Consequently, this information only came to light during the defense's general voir dire. *Id.* At that point she did reveal that her husband's congregation consisted of over 3,000 members, that her husband was the longtime senior pastor there, and that she was active in the church as well. *Id.* at 149–50. Though the prosecution might have requested further voir dire of Mitchell on her religious views at that point, this information seems sufficient to reveal, as the prosecution later claimed, that the political pressure on Mitchell as a minister's wife might be significant in participating in the verdict on a prominent death penalty case.

him.[15] Doc. 44, att. 20, pp. 33–38; Doc. 44, att. 11, pp. 33–34. The allegation that Mitchell's husband's church was predominately African-American provides little support of bias, as there is no indication of the racial make-up of the churches of any other prospective jurors who were asked about their religious beliefs. There is no indication of clear error in the trial court's findings with respect to Yvonne Mitchell.

### b. *Beatrice Maxile*

The prosecution justified its challenge against Beatrice Maxile based on the fact that she was a volunteer at Hamilton Terrace Alternative School, where the petitioner had been a student.[16] Doc. 44, att. 14, pp. 179–80. Although Maxile did not know the petitioner, the prosecution maintained that she would "be familiar with the reasons that students are at Hamilton Terrace" and that as a volunteer, "[s]he must have a great deal of love in her heart towards the children [there]." *Id.* at 180. It also expressed unease over Maxile as a death penalty-qualified juror. *Id.* Finally, there were additional concerns over Maxile's associations with Hamilton Terrace: she had already been contacted by a former coworker about the possibility that she would be a juror, and a former

---

[15] Valentine did make some statements that could be construed as revealing an unfavorable disposition towards the prosecution. As a pastor, he had written letters and attended hearings on behalf of criminal defendants. Doc. 44, att. 13, p. 36. He stated that he had thus "been on both ends of the spectrum" as a result of this experience and his family associations with violent crime, and that his faith "helped [him] to balance it out." *Id.* He also refused to volunteer any personal opinions on the death penalty beyond stating his belief "that if the laws that govern us state that if you commit this crime and that the death penalty is one of the penalties, then we're subject to it" and averring that he was "willing to follow the law" and could vote for the death penalty after taking into account all circumstances and mitigating factors. Doc. 44, att. 11, p. 33. He also stated that he would consider each mitigating factor "highly, because it is a life involved" but could vote for the death penalty after that consideration. *Id.* at 34. Finally, he stated that he believed he would be a good juror because he could draw on his experiences in counselling to "weigh everything and . . . balance it out." Doc. 44, att. 21, p. 222.

The petitioner contends that these statements are enough to cast doubt on the prosecution's justification for striking Mitchell. Doc. 1, p. 18. However, Valentine expressed his experiences writing letters and appearing at hearings on behalf of criminal defendants to balance out the fact that his wife and uncle had both been the victims of violent crime.  He also stated that he could ultimately vote for the death penalty after considering mitigating factors. The petitioner also points to no improper meaning behind his statement that he had experiences in counseling. Accordingly, we find this insufficient proof of pretext to upset the trial court's factual findings.

[16] Maxile was beginning her sixth year of teaching night school at Hamilton Terrace and her thirty-first year as a high school teacher at another school. Doc. 44, att. 12, p. 157.

Hamilton Terrace employee was expected to testify as a defense witness. *Id.* at 225–26; Doc. 44, att. 12, pp. 179, 182–85.

The petitioner maintains that Maxile's history with Hamilton Terrace would actually have worked against him.[17] Indeed, she testified that she knew students were not sent to Hamilton Terrace "unless there's some type of history" and that "you can visualize . . . situations that cause students to have to go [there]." *Id.* at 180–81. Therefore she stated that she would "probably" question testimony of the petitioner's good character. *Id.* at 182. He also points out that white juror Alden Reeves was seated despite being a high school athletic coach/physical education teacher and having testified as a character witness for a student convicted of murder. Doc. 44, att. 9, pp. 101–03. However, Reeves had an uncle who had been murdered. *Id.* at 101. He also expressed considerable skepticism about each potential death penalty-mitigating factor raised in voir dire. *Id.* at 112–15. Finally, his decision to testify as a character witness for the former student was largely based on his opinion that the boy had not been the shooter in that case. *Id.* at 154–55.

Additionally, the prosecution struck white prospective juror Kelly Guerrero, a school guidance counselor with no alleged connection to Hamilton Terrace. Doc. 44, att. 14, pp. 170, 218.[18] The petitioner contends that Guerrero's views on the death penalty were far less favorable to the prosecution than Maxile's, but this is unsupported by the record.[19] The prosecution justified

---

[17] He points to the testimony of another prospective juror that Maxile had a reputation as a tough teacher. Doc. 44, att. 14, pp. 122–23. However, he does not explain how this reputation should disprove that she loved her students or show that she would actually favor the death penalty for teenage offenders.

[18] Guerrero is also referred to as "Guerra" in portions of the transcript. *Compare, e.g.*, Doc. 44, att. 14, p. 170 *with* Doc. 44, att. 11, p. 2.

[19] Guerrero did state, as the petitioner contends, that she felt the death penalty should be limited to cases involving certain aggravating circumstances. However, she went on to say that she would give little credit to influence of another person as a mitigating factor (an element heavily relied upon by the defense) and that she could vote for the death penalty for a first-time offender if the crime were sufficiently horrendous. Doc. 44, att. 11, pp. 20–23. She also included rape, one of the allegations in this case, as a potential aggravating circumstance. *Id.* at 20. Meanwhile Maxile expressed particular abhorrence to the allegations. Doc. 44, att. 12, pp. 168–69. However, she also stated that she would consider all mitigating factors, based in particular on having seen peer pressure in school. *Id.* at 167–69.

the strikes of Guerrero and Maxile by stating, "To us it is not a good idea to have teachers and guidance counselors on a jury when the defendant is of the age that this defendant is; they are a little bit too close to home on that." *Id.* at 218–219. Even though this same reasoning was not used to strike Reeves, who also worked with teenagers, it was sufficiently race-neutral by its application to both Guerrero and Maxile. Furthermore there are insufficient grounds for discrediting the prosecution's reasoning based on Maxile's connection to Hamilton Terrace. Even though Maxile stated that she did not know the former Hamilton employee whom the defense intended to call as a witness, she might have given the witness's testimony undue credit based on their common experience. There is no indication of clear error in the trial court's findings with respect to Beatrice Maxile.

### c.  *Rose Bogan*

The prosecution exercised a peremptory strike against Bogan during strike-backs. Doc. 44, att. 14, pp. 163–64.  It justified the strike based on Bogan's responses to questions about her son's conviction:

> [H]er son was convicted when he was 19. The defendant sits before her now and is 19 years old. She too stated that her son was hanging out with the wrong crowd and that they may have convinced him to do what he did. She was not very engaging when questioned. She also answered very enthusiastically when asked by [the defense attorney] if her son had changed; she says, oh, yes he's changed since he got out of jail. She placed quite a bit of emphasis on this. Again, they are relying heavily on the mitigating factor of age and the influence of another, and we feel that she would not be a good juror on the panel for those reasons; it's too close to home for her.

*Id.* at 175–76. The voir dire transcript indicates that Bogan's son had been convicted of burglary two years prior. Doc. 44, att. 20, pp. 194–95. She stated that she was not upset that he was in jail because she had warned him about his actions and because the treatment he received was fair. *Id.* at 194, 196. However, she identified his problem leading up to the crime as "hanging with the

wrong people" (though she emphasized that her son's acts were his responsibility) and said that she believed he had learned a lesson from his incarceration. *Id.* at 194–95, 197.

The petitioner points to numerous white venire members who were not struck by the prosecution, despite having family members with criminal histories or teenage family members who had experienced some sort of rehabilitation. Juror Holley testified that he had a brother who began getting into trouble as a teenager and was currently incarcerated as a habitual offender. Doc. 44, att. 21, pp. 198–99. He stated:

> [W]e've always just been strangers that really have shared the same parents, if that's understandable. . . . I saw the pain that it caused my family and the things that he had to do, that he went through and that my parents went through to . . . retrieve him from jail or whatever. That may be a lot of the reason that . . . I just kind of detest that whole kind of way, you know. It causes a lot of pain, and it just seems to be a useless lifestyle in my eyes.

*Id.* at 199.  Prospective juror Maureen Jacobs testified that her brother had been incarcerated for nonpayment of child support. *Id.* at 201–02. She did not volunteer any views on the experience, beyond the statement that her brother had no other option due to his unemployment. *Id.* at 202. Juror Sepulvado[20] believed that his brother-in-law had not been treated fairly in his trial and conviction for buying votes. Doc. 44, att. 22, pp. 138–41; Doc. 44, att. 13, pp. 183–85. Juror Helen Hutchinson testified on the strong positive influence that the Marines had on her teenage son, by way of explaining her willingness to consider mitigating factors in sentencing. Doc. 44, att. 12, pp. 67–68. However, she did not indicate that her son had had any sort of criminal history.

Under clear error review, these examples are insufficiently analogous to show that the reasons for striking Bogan were pretextual. None of the above venire members tied a criminal history to a rehabilitation narrative. The petitioner points out that Bogan believed "[e]very kind of

---

[20] This juror's first name is rendered in the transcript as Rupert [doc. 44, att. 12, p. 2], Ruben [doc. 44, att. 16, p. 189], and Rufus [doc. 44, att. 21, p. 164].

murder deserves the death penalty" and expressed heavy skepticism about influence of another person as a mitigating factor.[21] Doc. 44, att. 12, pp. 10–12. She also stated that she had "no problem" with the police or criminal justice system and had heard about the petitioner's crime and "just [hated] that it happened." *Id.* at 80–81; Doc. 44, att. 20, p. 101. However, given the strength of Bogan's involvement with mitigating factors of the petitioner's case, these statements are likewise insufficient to establish clear error in the trial court's acceptance of the prosecution's race-neutral reasons for the strike.

Accordingly, there is no basis for overturning the finding as to Rose Bogan.

### d.  *Malenda Theus*

The prosecution justified its strike of Theus based on her statements about the burden of proof as well as her concerns about finding care for her sister. Doc. 44, att. 14, p. 171. The court rejected the first reason but noted that it shared the prosecution's concerns on Theus' hardship and thus found it "acceptable" as grounds for the strike. *Id.* at 172.

Malenda Theus stated that she was generally in favor of the death penalty when aggravating circumstances were involved, though she would also consider mitigating factors. Doc. 44, att. 9, pp. 79–80, 111–12. She also stated that she had become more pro-death penalty over the last five years because of a perceived rise in violent crime. *Id.* at 98–99. While she initially indicated that she would hold the prosecution to a greater standard than "beyond a reasonable doubt" in order to

---

[21] The petitioner alleges that the prosecution's bias was evident from its use of the "graphic script" in discussing the death penalty with Bogan. *See* Doc. 44, att. 12, p. 10 ("[Y]ou've got to understand what happens. If he gets the death penalty, he goes to Angola. He's on a gurney, they roll him in and they put a needle in his arm and they inject him with poison to kill him, and that's how the death penalty is administered in Louisiana.") He indicates three other places in voir dire where this script was used, with prospective jurors who had expressed some reservation about capital punishment. *See id.* at 24 (Christina Zuniga); Doc. 44, att. 11, pp. 33–34 (William Valentine); Doc. 44, att. 14, pp. 17–18 (Patricia London). However, by the petitioner's reckoning, Bogan and Patricia London are the only two African-Americans who were given the graphic script, and Bogan is the only prospective juror who was given the graphic script after expressing no ambivalence about the death penalty. This is insufficient data to support discriminatory application.

impose the death penalty, she also stated that she would obey the judge's instructions on what the appropriate burden of proof was. *Id.* at 81.

When asked whether she would be a good juror, however, Theus said she would not. Doc. 44, att. 10, p. 201. The following colloquy then took place:

> **Prosecutor:** And why is that?
>
> **Theus:** Well, just a lot of reason[s] because [it's a] hard decision, and plus I got a lot of other things . . . I wouldn't be able to concentrate.
>
> **Prosecutor:** So you have outside things you think that would weigh on your mind?
>
> **Theus:** Right. Because I got a handicapped sister that I have to take care of, and yesterday when I got there she was waiting on me, had to change her and feed her. And now today the same thing and I don't have anybody to take care of her.

*Id.*

The petitioner contends that the hardship was pretextual, based on the prosecution's failure to ask more questions on the subject. He points to the fact that the prosecution asked jurors Reeves and Sepulvado multiple questions about their work-related hardships and then failed to strike either. Sepulvado stated that jury duty "would put a real hardship on [him]" due to his responsibilities as superintendent at a plant with new ownership and as owner/operator of two water companies. Doc. 44, att. 12, pp. 34–36. The next day the prosecutor followed up with more questions. At that time it appeared that the hardship issue had been resolved with respect to Sepulvado's plant employment but he maintained that no one would take over his responsibilities with the water companies. Doc. 44, att. 13, pp. 112–13. Reeves, a high school football coach, also stated that he would have a difficult time finding someone to cover for him at work. Doc. 44, att. 10, pp. 203–06. He added that, while he would "have grief to bear later," "football games [are] not near as important as this particular case." *Id.* at 207.

-22-

Reeves' hardship was thus expressed in less dire terms than Sepulvado's or Theus'. As for the apparent double standard between Theus and Sepulvado, the respondent observes that family hardships are common themes in jury selection but that Sepulvado's situation – relating to who had the qualifications to carry out daily operations at his water company – was a unique one necessitating further inquiry. Defense counsel also asked Sepulvado several questions about the specifics of this hardship. Doc. 44, att. 20, pp. 153–56. Finally, it is especially noteworthy under the clear error standard of review that the trial court, which had the opportunity to observe Theus' demeanor, found her hardship sincere and the grounds for the strike acceptable. Because of the strength of the justification relating to Theus' hardship and the trial court's acceptance of the same, its rejection of the justification relating to the burden of proof is insufficient to establish discriminatory intent in the strike.

Accordingly, there is no indication of clear error in the trial court's findings as to Malenda Theus.

### e.  Margaret Scott

The prosecution justified its strike against Margaret Scott on her change in view on the death penalty:

> [She] stated that she was against the death penalty before her brother was killed. We were concerned [because] none of the other jurors stated that their opinions on the death penalty had changed that drastically, meaning they had not been opposed to it and suddenly agreed to it. Most maybe had gotten a little firmer on it or a little less insistent . . . but she said she was clearly against the death penalty before her brother was killed. She may not feel that way when the victim is someone who is not known to her.

Doc. 44, att. 14, p. 174. It also referenced the fact that Scott had a son who had been in trouble as a 17-year-old and that she attributed the trouble to "the people he was hanging around with and

drinking and whatever else he was involved in." *Id.* at 174–75. The defense made no comment on the prosecution's reasons. *Id.* at 175.

Margaret Scott testified that she had previously opposed the death penalty. Doc. 44, att. 11, p. 68. However, she came to favor it after her brother was killed based on her feeling that "the person that did it really and truly didn't get what they deserved." *Id.* She also stated that she would consider the death penalty appropriate based on the aggravating factors in this case. *Id.* at 40–41.

The petitioner contends that Scott still gave credible testimony of her ability to be fair. She did not express any animus against the criminal justice system based on the experience of her son or her sister, who had also been incarcerated. Doc. 44, att. 13, pp. 53–57. In fact, she stated that her sister "needed to go back" to prison and that she had turned her son in because she "would rather see him locked up than on the street and have something bad happen to him." *Id.* at 52–53. However, she also believed that her son would not have committed any crimes had it not been for the substances he was using and the people with whom he spent time. *Id.* at 55–56. The close involvement of these mitigating factors do not allow for a finding of clear error in the trial court's finding.

The petitioner also alleges pretext in the reasoning that Scott's death penalty views had changed too drastically. He points to the prosecution's failure to exercise a strike against white prospective juror Marjorie Fowle, who testified that her views on the death penalty had been shaped by the brutal murder of a friend. Doc. 44, att. 11, pp. 106–07. However, Fowle did not say she had ever opposed to the death penalty. She merely stated that the murder had "kind of hardened [my heart] as far as capital murder trials go." *Id.* at 106. Additionally, Fowle was then employed as a parole officer. *Id.* at 115–16. This affiliation could certainly lead the prosecution to believe she would be a favorable juror for the state, and in fact was part of the basis of the defense's

attempted challenge for cause. *Id.* The petitioner has not provided adequate grounds to support a finding of pretext under this court's standard of review. Accordingly, there is no basis for overturning the trial court's finding as to Margaret Scott.

>           *f.  Audrey Lewis*

The prosecution justified its strike of Audrey Lewis on the grounds that she was "non-responsive; she basically gave yes or no answers" in the first round of questioning. Doc. 44, att. 14, pp. 173–74. However, its chief concern was that she expressed "bitterness . . . towards the police department based on the fact that when her son was shot she was brushed to the side." *Id.* at 174. The prosecution maintained that, "based on her body language and her tone of voice, [Lewis] clearly had a problem with the police." *Id.* It also noted that the prosecutor in Wilson's case was responsible for the pending case against the alleged shooter of Lewis' son. *Id.* at 212.

Lewis stated that she believed in the death penalty and would also consider the mitigating factors raised by the defense. Doc. 44, att. 10, pp. 105–06. She described how her son-in-law had been the victim of a homicide three years earlier. Doc. 44, att. 13, pp. 38–39. She stated that she thought she would be a good juror because, "I just try to do the best job I can for what I'm chosen for." Doc. 44, att. 21, p. 223. However, she also spoke of a negative experience with a police officer. Her son had been shot recently and Lewis related that when she went to the scene to see what had happened, she was "pushed . . . to the side like [she] didn't exist" and "treated . . . like [she] was the criminal." *Id.* at 200. Lewis nonetheless maintained that she could evaluate law enforcement witnesses fairly, stating "I believe in the system. It's just the one incident that I didn't appreciate." *Id.* at 201.

Lewis described a recent and overwhelmingly negative encounter with law enforcement. The trial court, which had the benefit of observing her body language and her tone of voice, stated

that it was "comfortable with the State's articulation [for the strike] at the outset" and remained so after hearing arguments from both sides.[22] Doc. 44, att. 14, pp. 214–15. Accordingly, there is no indication of clear error in the trial court's finding as to Audrey Lewis.

### g.  Dameshia Fuller

The prosecution justified its strike against Fuller in large part because of her skepticism about accomplices who testified for plea bargains. Doc. 44, att. 14, pp. 219–20. The prosecution remarked on the possibility that it would call such a witness at trial, which it later did.[23] *Id.* at 220. It also noted that Fuller failed to appear when called for jury duty on a previous occasion, which she excused by stating that she forgot to show up, and that she had also failed to appear for the instant voir dire and had had to be called in by the judge's staff. *Id.* The prosecution further alleged that Fuller displayed "a very bad attitude" during a bench conference with the attorneys and the judge. *Id.* Finally, the prosecution alleged that Fuller was "tentative" about whether she could vote for the death penalty under the statutory burden of proof. *Id.* at 219–20.

Fuller stated that she was in favor of the death penalty and expressed skepticism on many of the defense's mitigating factors. Doc. 44, att. 12, pp. 134–37. She stated that she would have to "know for sure that she made the right decision" if the death penalty were an option, but agreed that she could still consider it if the prosecution had proven its case beyond a reasonable doubt. *Id.* at 136. However, she later agreed that participating in a death penalty verdict would be the most

---

[22] The petitioner alleges that bias is evident from the prosecution's failure to challenge Sepulvado, despite his views on his brother-in-law's trial. *See* Doc. 44, att. 22, pp. 138–41. However, as we noted previously, Sepulvado merely relates his opinion that he does not think his brother-in-law received a fair trial. Doc. 44, att. 13, pp. 184–85. He also believed that witnesses had perjured themselves in that trial and that he had "hard feelings" against the prosecutor in his brother-in-law's case for not also bringing charges against two others who were indicted with him. *Id.* at 185. However, this does not seem sufficiently analogous to Lewis' situation, where she was at the scene shortly after her son had been shot and personally being treated like a criminal by the police, to justify a finding of pretext under our deferential standard of review, especially given the fact that the prosecution expected to call police witnesses to testify. Doc. 44, att. 14, p. 174.

[23] This witness was Derrick Bouya, who testified at the penalty phase of the trial in exchange for being allowed to plead guilty to second degree murder for his involvement in the death of McGraw. *Wilson*, 938 So.2d at 1116 n. 1.

important decision she had ever made and that it was "one that I don't want to have to make." *Id.* at 175. She also expressed skepticism on the credibility of witnesses who received a plea bargain for their testimony. Doc. 44, att. 13, pp. 125–26. Considering a scenario where an accomplice who received a plea bargain was testifying, she said, "I would think they're just telling something to get something lighter, to be honest" and "I would think that they could have just told the truth from the beginning." *Id.* at 126.

Though Fuller seemed prepared to vote for the death penalty if it was warranted under the law and facts of the case, the transcript also provides support for the prosecution's allegations of tentativeness. The trial court, which had the opportunity to observe her demeanor and tone, offered no opposition to this justification. The petitioner alleges that pretext is also evident in the prosecution's plea bargain justification, based on its failure to challenge white prospective juror Carrie Dempsey.[24] Dempsey did state that she would be "real leery" of a witness who had received a plea bargain. Doc. 44, att. 10, p. 183. She then added that she "could give them the benefit of the doubt" and would carefully compare their testimony to the rest of the evidence. *Id.* Dempsey thus appeared altogether more likely to consider the testimony of a witness who had received a plea bargain. Finally, although the petitioner alleges that pretext is also evident from the prosecution's failure to question Fuller about her failures to appear, two occurrences is worrisome enough despite

---

[24] The petitioner also alleges evidence of discriminatory intent from the different ways that Dempsey and Fuller were questioned about their skepticism of plea bargain witnesses, pointing out that Fuller was asked, "But is there any chance you would really believe [the testimony]?" while Dempsey was asked, "Would you be careful, when you hear their testimony, to compare what they said to what other witnesses had said or what other evidence had shown to see if details are matched up?" Doc. 44, att. 13, p. 126; Doc. 44, att. 10, p. 183. However, Fuller was expressing considerably greater skepticism already, stating that "I don't think when you plea bargain for a lesser sentence and you come and tell the truth, I don't like that because you should just tell the truth whether you're getting something out of it or not." Doc. 44, att. 13, p. 126. Meanwhile Dempsey had just stated, "I would be leery. I would be real leery, but I'd have to watch their demeanor. I'd have to see listen [*sic*] what they had to say." Doc. 44, att. 10, p. 183. When the prosecutor responded with, "Okay," Dempsey added, "I could give them the benefit of the doubt, you know." *Id.* We therefore find no merit to the allegation that discriminatory intent was evident from the questions put to Dempsey and Fuller.

whatever excuses Fuller might have offered. The petitioner also puts forth nothing to contradict the testimony of Fuller's apparent bad attitude during the bench conference. Therefore there is no indication of clear error in the trial court's finding as to Dameshia Fuller.

### h.  Batson challenge considered comprehensively

Despite the fact that a disproportionate number of African-American women were struck, the prosecution offered persuasive, race-neutral reasons as to each prospective juror, which were accepted by the trial court. The prosecution also allowed two female African-American jurors to be empaneled without exhausting its peremptory strikes. *See* Doc. 44, att. 14, pp. 169–70. The petitioner has failed to rebut the trial court's finding by clear and convincing evidence, and so there is no basis for disturbing the trial court's ruling on the *Batson* challenge. Accordingly, this claim does not invite federal habeas relief.

### 3.  Whether the petitioner's sentence of life without the possibility of parole is unconstitutional.

The petitioner alleges that his mandatory sentence of life without the possibility of parole is unconstitutional under the Eighth and Fourteenth Amendments, in light of the Supreme Court's ruling in *Miller v. Alabama*. Finding that this matter is confined to the question of *Miller*'s retroactive applicability, we review it as a question of law.

A new rule of federal constitutional law is not applied retroactively unless it meets one of the two exceptions outlined by the Supreme Court in *Teague v. Lane*. 109 S.Ct. 1060, 1075–76 (1989). The first exception applies to substantive rules, which include "constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Schriro v. Summerlin*, 124 S.Ct. 2519, 2522 (2004). "Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of

an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id.* at 2522–23 (internal quotations omitted).

While the instant petition was pending before this court, the Supreme Court issued an opinion in *Montgomery v. Louisiana*, 577 U.S. ___ (2016) (slip op.) There the Court decided that *Miller*'s ban on mandatory life without parole for juvenile offenders was a new substantive rule, meaning that it is retroactively applicable. *Id.* at 17, 20. Accordingly, the petitioner's sentence is now unconstitutional and the writ should be granted with respect to this claim. The petitioner is therefore entitled to resentencing in the state court.

## IV.
### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the petition be **GRANTED IN PART** as it relates to his sentencing claim and that the case be remanded to state court for resentencing. The remainder of the instant petition should be **DENIED** and **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court.  Timely objections will be considered by the district judge prior to a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429–30 (5th Cir.  1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.  *See* 28 U.S.C. § 2253(c)(2).  A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE AND SIGNED in Chambers this 4th day of February, 2016.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE